United States Court of Appeals
Fifth Circuit

**F I L E D**

May 18, 2007

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 05-30744

DANIEL C. JENKINS,

Plaintiff-Appellant,

versus

CLECO POWER LLC,
LIBERTY LIFE ASSURANCE COMPANY OF BOSTON

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Louisiana

Before JONES, Chief Judge and JOLLY and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Appellant Daniel Jenkins ("Jenkins") brought a disability discrimination suit against Cleco Power, LLC ("Cleco") and Liberty Life Assurance Co. ("Liberty") pursuant to the Americans with Disabilities Act of 1990, 29 U.S.C. § 12101, et seq. ("ADA"), a similar state law regulation, the Louisiana Employment Discrimination Law, L.S.A.-R.S. 23:322-324 ("LEDL"), and the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. Jenkins appeals the district court's grant of summary judgment to Liberty and the involuntary dismissal of his claims against Cleco. For the following reasons, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Jenkins worked for Cleco as a Senior Line Mechanic (lineman) for fourteen years when, on September 26, 1993, a utility pole which he was climbing broke, causing him to fall to the ground and fracture his left femur. The comminuted fracture required extensive surgery, which was performed by Dr. Douglas Waldman, an Orthopedic Surgeon and Jenkins' primary treating physician. The injury resulted in some permanent deformity to the leg and difficulty with motion and weight bearing and causes the leg to lock and limited his physical capacity to perform several job-related tasks, including the ability to sit for extended periods. Jenkins went on disability until November 1994, when he returned to his previous position with restrictions that he not climb. He patrolled the lines, performed monitoring activities, and continued physical therapy sessions. Because Jenkins was not fully performing his duties, Cleco transferred him to the position of Customer Service Specialist on June 3, 1995.

Jenkins again went on short term disability leave from November 1, 1996, to December 8, 1996, when Cleco informed him that his job duties as Customer Service Specialist did not conform with Dr. Waldman's restrictions on his employment. At that time, Dr. Waldman had written a letter saying that Jenkins should not work unaccompanied and should not work on rough terrain with unsure footing, climb ladders, and work at night or in an isolated situation. After Dr. Waldman modified the restrictions, Jenkins returned to work again as a Customer Service Specialist, where he remained until October 14, 1997.

After Jenkins' leg began to swell, Dr. Waldman again said Jenkins could not perform the job as Customer Service Specialist. On October 14, 1997, Jenkins again went on disability until

December 10, 1999. While on disability, in June 1998, Jenkins applied for the job of Service Planner, which he had heard about from co-workers, because he thought it would meet his physical needs. The job of Service Planner involved helping customers plan electrical service, oftentimes walking in rough terrain, jumping fences, creeks, ditches and occasionally climbing over fences. Overall, Jenkins argues, the job was less physically difficult than that of Customer Service Specialist. However, Jenkins did not get the job.

On November 22, 1999, Jenkins wrote to Richard Sasser, Human Resources Manager, informing him that Dr. Waldman had again released him to do the job of Customer Service Specialist. Jenkins testified that he would also have been willing to do other jobs as well. Sasser responded that there were no vacant Customer Service Specialist positions but that arrangements had been made for Cleco to retrain Jenkins with computer skills so that he could become a dispatcher or "related position", which Sasser testified only meant Call Center Specialist. Sasser testified that Jenkins was given a job classification so that he would receive a paycheck, and Jenkins began training. A short time after Jenkins started his training, he went to Sasser and, according to Sasser, said he did not want to continue the training. Jenkins was concerned with the amount of money he was making, with "keeping his options open", and with accommodations for his leg. The two agreed that Jenkins would take a couple of days off and think about it. Jenkins left Sasser a message the next day that he would continue with the training and was back in training Monday morning.

By February, 2000, Cleco had determined that Jenkins was sufficiently trained, and Sasser sent Jenkins a letter, dated February 2, 2000, offering him the position of Call Center Specialist. Prior to that time, Sasser received a copy of a letter from Dr. Waldman to Liberty, stating that Jenkins could "try a call center position if he could alternate between sitting and standing. However, we

3

would have to see how he did with his job before releasing him permanently." Dr. Waldman stated that Jenkins would not be able to sit through eight hour days of training without breaks and that Jenkins' impairments had been previously outlined on March 1999.

Jenkins expressed several concerns to Sasser. Sasser testified that plaintiff voiced two concerns: one that the job did not pay as much money as he thought he should be paid and two, "he was concerned about sitting for eight hours a day . . . ." Sasser explained that the company was willing to accommodate him and he needed to "really go home and think about this." Plaintiff did not learn from Cleco at the meeting what the physical aspects of the job would involve as far as sitting and standing.

Jenkins testified that he wanted to talk to Dr. Waldman about the job, and he convinced Sasser to give him time to think about the offer. Sasser allowed plaintiff to take a week of vacation to decide what he wanted to do. During that week, Jenkins returned to see Dr. Waldman. Jenkins told Dr. Waldman that he would have difficulty sitting at a desk where he would be cramped. Jenkins also told the doctor that it was an eight hour job and "you had to stay at the desk to perform the job." Jenkins admitted, however, that he did not have a copy of the job description of Call Center Specialist. Jenkins testified he did not know of Dr. Waldman's January 16, 2000 letter allowing him to "try" the Call Center job, if he could alternate sitting and standing.

Jenkins then sent Sasser the letter dated February 11, 2000, in which he declined the offer of the Call Center job, saying that he could not meet the physical job requirements because of the sitting. Jenkins attached Dr. Waldman's report of February 8, 2000. Jenkins was terminated by Cleco on May 1, 2000. Liberty denied his claim for continuing disability benefits soon thereafter.

4

On December 26, 2000, Jenkins filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Notice of Right to Sue on February 28, 2001, and Jenkins brought suit on May 30, 2001, against Cleco and Liberty, seeking compensatory and punitive damages, back and front pay and benefits, and reasonable attorney's fees and costs. Jenkins asserted claims under ERISA, the ADA, and the LEDL. Liberty removed the case to federal district court on July 25, 2001.

The district court granted summary judgment for Liberty on Jenkins' ERISA claim, concluding that Liberty had not clearly erred in determining that Jenkins was not totally disabled. After a bench trial before the Magistrate Judge on Jenkins' remaining claims, Cleco moved for involuntary dismissal under FED. R. CIV. P. 41(b), which was granted. The court concluded that Jenkins failed to establish that he was disabled as defined by the ADA and, regardless, was unable to prove that Cleco failed to reasonably accommodate him. The court also concluded that Jenkins had failed to prove that Cleco retaliated against him for requesting reasonable accommodations.

Jenkins appeals the court's summary judgment ruling and involuntary dismissal of his claims.

## II. STANDARD OF REVIEW

### A. Summary Judgment

This court reviews a district court's grant of summary judgment de novo, applying the same standards as the trial court. *See Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 205 (5th Cir. 1998). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Crawford v. Formosa*

*Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).

In an ERISA action, the plan administrator is granted discretionary authority to construe the plan documents and determine benefit eligibility. *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 332-33 (5th Cir. 2001). Courts review the denial of benefits under an abuse of discretion standard. *Id.* The administrator's decision will only be upset if it acted in an arbitrary or capricious manner in denying benefits. *Matassarin v. Lynch*, 174 F.3d 549, 563 (5th Cir. 1999). A decision is arbitrary when it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996). When the administrator is also the insurer of the plan, there is a conflict of interest and the abuse of discretion standard is somewhat less deferential. *Gooden*, 250 F.3d at 333. Reviewing courts are limited to the administrative record and may inquire only "whether the 'record adequately supports the administrator's decision.'" *Id.* (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 298 (5th Cir. 1999) (en banc).

B. FED. R. CIV. P. 41(b) Dismissal

This court reviews factual findings following a Rule 41(b) dismissal under a clearly erroneous standard. *Prof'l Geophysics, Inc. v. Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991). A district court's legal conclusion at a bench trial are reviewed de novo. *Adkins v. Kaspar*, 393 F.3d 559, 563 (5th Cir. 2004).

III.  DISCUSSION

A. Summary Judgment

Liberty denied Jenkins' claims for continuing disability, concluding that he was not totally disabled, as defined by his insurance plan, because although he was unable to continue in his previous

6

position, there were numerous other jobs Jenkins could perform. Jenkins alleged that this was an abuse of Liberty's discretion as a plan administrator and that Liberty did not act in good faith in its review of his application.

Liberty's disability plan, which covered Jenkins, states, in part, that continuing disability benefits are provided to those who are: "unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity."

Jenkins argues that the "most telling evidence" of Liberty's lack of good faith in denying his long-term disability benefits and of Liberty's abuse of discretion in denying those benefits, is a March 19, 2000 memorandum written by an employee of Liberty describing the need to find jobs in the area which Jenkins could fill.[1] Jenkins claims that this memorandum demonstrates that Liberty attempted to craft a vocational rehabilitation report solely to justify a denial of his benefits. Contrary to Jenkins' arguments, the memorandum does not demonstrate this; Jenkins could not receive benefits unless there were no occupations in the area that he could perform. Therefore, Liberty was justified in conducting an inquiry as to whether there were any such jobs.

Jenkins also takes issue with evidence and data relied on by Liberty to prepare the "Vocational Case Management" report, which concluded that Jenkins was employable in certain jobs within his area. The report cannot be said to be arbitrary or capricious. The report identified an available job at a local newspaper that someone with Jenkins' characteristics could fill. This rebuts the proposition

---

[1]The March 19, 2000, memorandum reads: "Need to determine other occupations clmnt can perform based on his education, skills & earnings & R&L's & to factor in where he resides. Clmnt lives in rural area. Clmnt. denied Not TD Any Occ based on his RTW part time for training. Need to focus on specific jobs (if any) clmnt. can perform for stronger NOT TD AO denial."

that Jenkins was "unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation."

Based on the evidence and the parties' arguments, we cannot conclude that Liberty's decision was made "without a rational connection between the known facts and the decision or between the found facts and the evidence."

B. FED. R. CIV. P. 41(b) Dismissal

To prevail on his ADA claim, Jenkins must establish that 1) he has a disability; 2) he is qualified for the position in which he seeks employment; and 3) he was discriminated against because of his disability. *Gonzales v. City of New Braunfels*, 176 F.3d 834, 836 (5th Cir. 2005). The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A); *see also Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 111 (5th Cir. 2005).

This court has recognized that, while not specifically listed in the EEOC regulations, "major life activities could include lifting, reaching, sitting, or standing." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725, n. 7 (5th Cir. 1995). Major life activities refers to those activities that are of central importance to most people's everyday lives. Jenkins alleges that his leg injury and resulting restrictions substantially limited him in the major life activities of climbing, walking on rough terrain, and sitting.

The court correctly concluded that sitting qualified as a major life activity in this instance; however, the court incorrectly concluded that Jenkins was not substantially limited in sitting. Dr. Waldman testified that Jenkins can, with intermittent breaks, sit for up to three hours per day, directly contradicting the court's conclusion that Jenkins could sit for up to three hours at a time. The court

also mischaracterized the computer training evidence. Jenkins testified that sitting during the training was difficult and that others noticed his discomfort, directly contradicting the court's conclusion that he underwent the training "without complaint." Because over the course of the day Jenkins' ability to sit is significantly more restricted than the average person, *see* 29 C.F.R. § 1630.2(j) (1) (ii), the court clearly erred in finding that Jenkins is not disabled within the meaning of the ADA.

Assuming that Jenkins is disabled, he must still prove that Cleco failed to reasonably accommodate him. *See* 42 U.S.C. § 12112(b)(5)(A). It is the plaintiff's burden to request reasonable accommodations. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 n.4 (5th Cir. 1999). When no reasonable accommodation can be made to the plaintiff's prior job, he may be transferred to another position. § 12111(9)(B); *Gonzales*, 176 F.3d at 838. The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform. *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 & n.14 (5th Cir. 1997). A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously. *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 622-23 (5th Cir. 2000).

Jenkins alleges that Cleco failed to engage in an "interactive process" with him to find a reasonable accommodation. "When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Loulseged*, 178 F.3d at 736; *see also Cutrera*, 429 F.3d at 113 (employer may not stymie process by terminating employee before an accommodation can be considered); *Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209, 213 & n.5 (5th Cir. 2000) (en banc) (employer must not obstruct process and must make effort to communicate with employee and provide accommodations based

on available information); *Loulseged*, 178 F.3d at 737-39 (each party must engage in the process); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317-18 (3d Cir. 1999) (employer has duty to seek specific information to enable it to make accommodations); *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) (failure to communicate indicates bad faith).

Jenkins' interactive process argument rests on his claim that he was unaware of Dr. Waldman's January 16, 2000 letter clearing him provisionally for the Call Center Specialist position.[2] Jenkins argues that Dr. Waldman told him that he was not cleared for the position and if he had known about the previous letter, he would have accepted the job. Jenkins argues that Cleco was responsible for clearing up his confusion regarding Dr. Waldman's recommendations and that their failure to do so indicates an unwillingness to engage in a good faith attempt at finding reasonable accommodations.

Jenkins' claims that Dr. Waldman gave inconsistent recommendations are not supported by the record. Dr. Waldman changed his opinion about the Call Center Specialist position in a February 8, 2000 letter, only after Jenkins told him that the job required him to sit for eight hours and engage in field work. The substance of Dr. Waldman's recommendations, which were that Jenkins could possibly work if he could alternate between sitting and standing, never changed. Jenkins gave this description to Dr. Waldman without having seen the actual job description, without discussing with Cleco the specific job duties, and without discussing with Cleco whether he could perform the job with alternate sitting and standing or other accommodation.

Following his initial injury, Cleco had placed Jenkins in several different positions, in an effort

---

[2]Dr. Waldman's letter stated "He might be able to try the Call Center Specialist position if he could alternate between siting and standing. However, we would have to see how he did with his job before releasing him permanently."

10

to find the most optimal accommodation. Cleco was well aware of Jenkins' limitation when it offered him the Call Center Specialist position. The record simply does not indicate that Cleco failed to engage Jenkins in an interactive process or that it is responsible for Jenkins' rejection of the Call Center Specialist position.

Jenkins also alleges that Cleco retaliated against him by terminating him for requesting reasonable accommodations. *See* 42 U.S.C. § 12203(a). These types of retaliation claims are analyzed under the *McDonnell Douglas* three-step framework. *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1121-22 (5th Cir. 1998). First Jenkins must establish a prima facie case. Next, Cleco must put forth a legitimate, nondiscriminatory reason for the employment action. *Id.* at 1222. Finally, Jenkins must prove that the proffered reason is pretextual.

Jenkins has established a prima facie case.[3] Cleco has put forth a legitimate, nondiscriminatory reason for the employment action, which is that Jenkins refused reasonable accommodation. Therefore, the claim turns on whether Jenkins can prove that the proffered reason is a pretext. Jenkins, however, does not make any argument regarding Cleco's proffered reason or point to any evidence demonstrating that Cleco's proffered reason is pretextual. Finding none, we agree with the district court that there is no evidence of retaliation.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.    AFFIRMED.

---

[3] To establish a prima facie case of retaliation, Jenkins must prove that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the first two elements. *Sherrod* 132 F.3d at 1222 & n.8. Jenkins' retaliation claim meets the prima facie requirements.