

# NUMBER 13-24-00021-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

UNIVERSITY OF TEXAS
AT SAN ANTONIO,                                                    **Appellant,**

**v.**

DAMIEN WILKERSON,                                                  **Appellee.**

## ON APPEAL FROM THE 57TH DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca**
**Memorandum Opinion by Justice Silva**

Appellant, the University of Texas at San Antonio (UTSA), appeals the trial court's

denial of its amended plea to the jurisdiction and traditional and no-evidence motions for

summary judgment regarding appellee Damien Wilkerson's claims that UTSA committed

violations of the Texas Commission on Human Rights Act (TCHRA). In five issues, which

we reorganize and renumber, UTSA argues the trial court's denial was erroneous because its sovereign immunity was not waived for each of Wilkerson's TCHRA claims. We reverse and render.

<h1 style="text-align:center">I.     BACKGROUND[1, 2]</h1>

## A.    Wilkerson's Employment, Accommodation Request, and Termination

UTSA employed Wilkerson as a warehouse worker from August 11, 2011, until until terminating him on January 21, 2021. According to UTSA's job description, a warehouse worker has nine "[t]ypical" duties:

1. Responsible for receiving, inspecting, and delivering incoming freight, priority/ground shipments, and supplies; checking merchandise against vendor paperwork; processing outgoing priority/ground packages; operating all types of warehouse equipment; reports and handles problems of damaged items.

2. Performs clerical functions including answering telephone inquiries; storing, maintaining and retrieving records; creating receiving reports; and maintaining records of inventory.

3. Responsible for properly loading and unloading items in an organized, clean, accurate and damage free manner.

4. Maintains a clean and safe work area at all times.

5. Takes a proactive approach to assist co-workers in loading and unloading, to ensure safety.

6. Performs work tasks in a safe manner and in accordance with work instructions.

---

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). Because this is a transfer case, we apply the precedent of the San Antonio Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

[2] The background is derived from the evidence and pleadings in the record.

7. Proactively makes recommendations to improve safety.

8. Completes work assignments in a timely manner, while utilizing equipment and teamwork effectively.

9. Perform other duties as assigned.

According to Javier Gonzales, UTSA's Assistant Manager of Distribution Services and Wilkerson's supervisor,

> [t]he majority of the job duties of an individual [w]arehouse [w]orker . . . are performed in the warehouse and require an employee's presence at the university. For example, the warehouse workers are broken into two teams—a warehouse team and a delivery team. The warehouse team spends approximately 4-5 hours per day unloading shipments and deliveries. The warehouse team then spends approximately 2-3 hours per day processing those incoming shipments and deliveries and preparing outgoing shipments for pickup. The delivery team spends approximately 8 hours per day loading their trucks to then make and unload deliveries to various points on the university campus. The two teams rotate every two weeks.

> []The warehouse workers also need to be present on campus or at the warehouse to work together as a team, so the loading, unloading, delivering, and shipping is done as efficiently as possible; the workload is evenly distributed; and the workers are not overworked or exhausted from physical labor. If a warehouse worker was at[ ]home, that worker would not be performing warehouse work, and the warehouse would have effectively lost a member of the team. The remaining workers would have to work harder and longer to make up for the lost team member.

> []The warehouse workers may spend approximately 1-2 hours each day performing work that could be characterized as clerical or administrative, but this work still needs to be performed in the warehouse. If a university employee calls the warehouse to check on the status of a package, a worker will generally need to have physical access to the packages in order to locate it. If a warehouse worker needs to ship a package, they will need to have physical access to the package, packaging, and printed shipping labels. Further, the warehouse would need to pay a licensing fee in order for an individual worker to access the software from a computer off-site.

On March 25, 2020, during the COVID-19 pandemic, UTSA's Associate Vice

3

President for Human Resources Sylvia Enriquez sent a letter confirming that UTSA is an "Exempted Business—Education and Research" for purposes of the "Stay Home, Work Safe Measures" that were imposed via executive orders issued by the City of San Antonio and Bexar County. She further confirmed that Wilkerson was a UTSA employee and stated that "UTSA will continue to operate onsite with a limited workforce and this employee is hereby deemed to be an essential part of such workforce and permitted under the terms of the [e]xecutive [o]rders to travel to and from, and work on, UTSA premises, until further notice." UTSA implemented a rotating schedule to limit the number of workers in the warehouse. Wilkerson, along with four other employees, began the rotating schedule in March 2020. Some weeks, Wilkerson worked in the warehouse on Monday, Tuesday, and Wednesday with Thursdays and Fridays off. In other weeks, he worked Wednesday, Thursday, and Friday with Mondays and Tuesdays off. According to Gonzales,

> [d]uring the rotating schedule, the warehouse workers, including [Wilkerson], worked in the warehouse on campus or made deliveries two or three days per week. When they were not working on campus, they were at home, simply on-call or completing online trainings provided by the university. [Wilkerson] and the warehouse workers were not assigned work to perform while at home. They were essential workers and their work needed to be performed in-person and on-site. The university paid the warehouse workers a full-time salary, even though they were not working full-time at home.

On October 9, 2020, Wilkerson took a medical leave of absence. On October 13, 2020, Wilkerson emailed Gonzales requesting that he be provided an accommodation to work from home because he suffered from Phobic Anxiety Disorder stemming from "being assaulted while [he] was driving." Wilkerson further explained that the condition prevented

4

him "from driving and even exhibits itself when [he is] a passenger in a vehicle." He further stated that he could "fulfill [seven] of the [nine] typical duties . . . while working from home," and that "a work-at-home position could still fulfill [his] service to [UTSA] in a support role while not putting undue hardships upon the department." Wilkerson attached an "Applicant Accommodation Request Form" to his email, wherein he wrote that he had "Phobic Anxiety Disorder stemming from PTSD" and that he has "extreme anxiety" when commuting to and from work, whether he is the driver or a passenger in a vehicle. Wilkerson also checked the box indicating his condition was "permanent," and wrote that he was requesting work from home or "reclassification to Admin. if needed" as a reasonable accommodation. On the same day, UTSA's American with Disabilities Act (ADA) Coordinator Sylvia Esparza responded to Wilkerson's email and requested that Wilkerson's doctor complete a medical inquiry form and submit supporting documentation "to begin the interactive process."

According to Gonzales, on October 16, 2020, UTSA "began calling employees, including the warehouse workers, back to working full-time . . . ." Gonzales stated that he and his supervisor Frank Salinas, UTSA's Manager of Distribution Services, were instructed to "end the rotating schedule and require the warehouse workers to attend work in-person five days per week." On the same day, Gonzales sent an email to Wilkerson and other warehouse employees, informing them that "starting Monday 10/19/2020, everyone is scheduled to work, until further notice. We will not have a rotating schedule anymore starting Monday, unless told otherwise at a later date."

On November 3, 2020, Dr. Rachel Hedrick submitted a medical inquiry form in

5

support of Wilkerson's accommodation request. Hedrick stated that Wilkerson "suffers from panic disorder as well as post-traumatic stress disorder, acute." She further stated that this impairment "substantially limit[s] . . . major life activit[ies]" such as thinking, sleeping, driving, and working. Hedrick further explained that Wilkerson's "panic causes difficulty thinking and concentration while driving [and] interferes with interactivity with customers due to high cortisol levels which cloud problem solving." She stated that "it is unclear as to the duration of the symptoms" and that the impairment was not permanent but "contingent upon treatment," and she recommended that Wilkerson work from home.

On November 5, 2020, Esparza met with Gonzales, Salinas, and Cheryl Huguley, UTSA's ADA liaison and human resources representative, to discuss Wilkerson's accommodations request and other potential accommodations.

The next day, Gonzales and Salinas had a follow-up call with Esparza and Huguley regarding Wilkerson's request to work from home as a disability accommodation. According to Gonzales, he and Salinas informed Esparza and Huguley that Wilkerson's request to work from home could not be accommodated because the job duties of a warehouse worker had to be performed in the warehouse or on the UTSA campus. On the same day, Wilkerson met with Esparza and Huguley regarding his accommodations request via remote videoconference. During the videoconference, they went over which duties Wilkerson believed he could perform for his warehouse job from home. Wilkerson stated that he could "definitely do [job duty] number two. That would be like the majority." He also stated that he could not perform job duty numbers one, three, and five, but could do the rest from home. Huguley suggested that working from home was not a reasonable

6

accommodation for his warehouse job, and asked Wilkerson if there was anything else that they could do to accommodate him. In response, Wilkerson then asked if he could be transferred to a different department that could accommodate him. Huguley responded:

> Yes. So yeah, we can transfer—we can try to find—transfer you to accommodation. Now, we have looked into that because—[Esparza] and I. [Esparza]'s the ADA coordinator. We have looked into that. Right now there are no other positions open that you will have to apply to. Still, you have to be qualified for those jobs. They have no other positions for you. You know, they really don't. And we've looked not only just in your area right there on the warehouse, but we've also talked to Diane Macias[-Ollervidez, UTSA's Assistant Vice President for Supply Chain,] to see do you have any other open positions. But because of the [reduction in force] that [UTSA] just went through, there are no other positions that you—that they can transfer—you know, talk to—to transferring you to. But even if they transfer you, we would still have to let you apply to that job. And they don't have any.

Huguley then asked Wilkerson how often and how long he suffered from panic attacks, and Wilkerson responded, "Well, according to my doctor, my panic attacks could take probably most of the day." Wilkerson also stated that these panic attacks occurred when he drove or rode in a vehicle. When Huguley asked Wilkerson if he could be accommodated by being permitted a thirty-minute break when suffering a panic attack, Wilkerson replied, "No. I've had that issue in the past, but sometimes it can be 45 minutes, an hour, or the rest of the afternoon. It depends upon the attack. It depends on the trigger. A lot of it has to do—my triggers are associated with people I work with." The following exchange then occurred:

| [Wilkerson]: | So being in the warehouse and hav[ing] . . . face-to-face conversations with like my coworkers, customers— |
|---|---|
| [Huguley]: | Uh-huh. |

7

[Wilkerson]: —causes me great distress and its not going to end—

[Huguley]: Right.

[Wilkerson]: —because then another customer is going to come in, then another coworker is going to come in, then another customers [sic] come in. And it's not going to end.

. . . .

[Esparza]: A while ago you had asked about transferring to another department.

. . . .

[Esparza]: . . . [C]ould you give me some idea of what other jobs you've seen that—

[Wilkerson]: I've—

[Esparza]: —might work?

[Wilkerson]: I've applied for Admin 1, Admin 2. I've applied for a security guard position, which . . . I'm not okay doing anymore.

[Esparza]: Yeah.

[Wilkerson]: There's been a job downtown. I was actually at the second interview with the job downtown working for the counseling department when—

[Esparza]: Uh-huh.

[Wilkerson]: —my assistant manager approached me and says, "hey, put me down as a reference" and then gave me a bad reference.

[Huguley]: Oh, my goodness. For which job was that then?

[Wilkerson]: That was for an Admin 2 position working for

8

|  |  |
|---|---|
|  | counseling the year before last, 2017. |
| [Huguley]: | Doctor—oh, really? |
| [Unidentified Speaker]: | Was it [Gonzales]? |
| [Esparza]: | So you would be okay— |
| [Wilkerson]: | It wasn't [Gonzales]. |
| [Esparza]: | —doing some type of— |
| [Wilkerson]: | That was Ben Moran, which is why he's no longer here because we went through EOS and now— |
| [Esparza]: | Who was he? |
| [Wilkerson]: | That was Ben Moran. And I filed— |
| [Huguley]: | Oh, yeah, yeah. |
| [Wilkerson]: | —a claim with EOS, and that's why he's not—no longer with UTSA. |
| . . . . |  |
| [Esparza]: | So you would be okay doing administrative type work? |
| [Wilkerson]: | Absolutely. |
| [Esparza]: | Okay. |
| [Huguley]: | Are there any other—have you applied lately? |
| [Wilkerson]: | I haven't seen anything lately because I've been trying to work through this process. |
| . . . . |  |
|  | I want to work. I want to support my family. Because of these—this history— |

| | |
|---|---|
| [Huguley]: | Yeah. |
| [Wilkerson]: | —with my department, the history with my management— |
| [Huguley]: | Uh-huh. |
| [Wilkerson]: | —the history—my previous just personal history with driving, it has made it nearly impossible for me to go to work to complete my job. |

Later that same day, Esparza and Huguley met with Gonzales, Salinas, and Macias-Ollervidez. Macias-Ollervidez was Gonzales's and Salinas's supervisor. Macias-Ollervidez confirmed that there were no vacancies within her supervision due to the recent reduction in force.

On November 9, 2020, Wilkerson emailed Esparza and informed her that he had found two positions he qualified for, including "Communications Spec. [-] Business Affairs" and "Senior Admin. Assoc. [-] Modern Languages." Esparza replied and asked Wilkerson if he had applied for those positions. Wilkerson informed Esparza that he had applied for the "Senior Admin Assoc." position.

On November 20, 2020, Esparza and Huguley met with Gonzales and Salinas again to discuss the essential job duties of a warehouse worker. According to Esparza, they determined that "a majority of the job duties of an individual [w]arehouse [w]orker . . . are performed in the warehouse and require an employee's presence at the warehouse."

On December 9, 2020, Huguley sent Wilkerson a letter regarding his request for accommodations. She also emailed Wilkerson a copy of the letter. In the letter, she informed him that his request for an accommodation "to perform telework from home for

an indefinite timeframe, due to the unclear duration of the symptoms of [his] medical condition" was denied. She further stated that "telework for a [w]arehouse [w]orker . . . is not a reasonable accommodation as the position requires duties to be performed at the warehouse, to include receiving, delivery, storing, inventory, issuance of supplies, loading, and unloading, driving, distributions, social, and customer interaction." Huguley also explained that UTSA "ha[s] been unable to identify any other reasonable accommodation that would allow [him] to perform the essential functions of [his] job outside the premises of the warehouse." The letter also stated, "If you do not return to work on Thursday, December 10, 2020, your employment at UTSA as a [w]arehouse [w]orker[ ]will be terminated." On the same day, Wilkerson attempted to appeal the denial of his accommodation request by sending an email "grievance," but the email was sent to an unmonitored UTSA email account.[3]

On December 10, 2020, Wilkerson reported to work without a medical release. Gonzales informed Wilkerson that he would need to produce a signed medical release form from his doctor, in compliance with UTSA's policy, to be approved to work. Gonzales then sent Wilkerson home. That same day, Huguley emailed Wilkerson that the "ADA office had a second meeting . . . and it was concluded that you are required to return to work by December 17, 2020. This would allow you to meet with your health care provider prior to your return." The next day, Hedrick signed a "Return to Work Release Form" in which she indicated that Wilkerson could return to work on December 18, 2020, subject

---

[3] According to UTSA's "Handbook of Operating Procedures," an employee not satisfied "with the decision given by the ADA Coordinator" concerning a request for accommodation "may file a grievance with the Vice President of Business Affairs."

11

to restrictions ending on November 2, 2021. Specifically, Hedrick indicated on the form that Wilkerson could not drive equipment or vehicles, nor work with machinery. Additionally, Hedrick emailed Esparza on December 14, 2020, stating:

> I understand additional information is needed for . . . Wilkerson's accommodation request. The nature of his impairment is mental health. Specifically, he has been diagnosed with post-traumatic stress disorder and panic disorder. Functional limitations include driving and operating heavy machinery. Because his essential job duties include said duties, we are requesting the accommodation be that he work from home.

She also stated that she "project[ed] a year long duration before symptoms subside to the extent that [Wilkerson] can perform his current job duties."

On December 15, 2020, Esparza emailed Wilkerson and informed him that she had received "the requested additional information from [his] health provider." In the email, Esparza asked, "Other than being transferred to the Modern Languages Department . . . and telecommuting, are there any other forms of accommodation you or your health provider are proposing to use to address the limitations?" Wilkerson replied the next day, stating, "Not at this time. Thank you."

On December 21, 2020, Wilkerson emailed Gonzales to state that he was working from home per Hedrick's recommendation and to request "work assignments" which could be completed from home.

On January 4, 2021, Huguley sent Wilkerson a letter acknowledging receipt of "the additional medical note and return to work release form." The letter stated that, based on the additional medical documentation and prior conversations "within the interactive process," UTSA was "unable to identify any accommodation that would allow [Wilkerson] to perform the essential functions of [his] job with or without accommodation." The letter

12

informed Wilkerson that his request to "telework from home" was denied.

On January 13, 2021, Veronica Mendez, UTSA Senior Vice President for Business Affairs, received Wilkerson's subsequent "grievance" concerning the denial of his accommodation request. On January 16, 2021, Mendez sent Wilkerson a letter stating that she "concur[red] with the determination of the ADA Office and affirm that your request from an accommodation is denied."

On January 22, 2021, Salinas emailed Wilkerson UTSA's "final response" letter to his accommodation request. This letter was signed by Salinas and dated January 21, 2021. In the letter, Salinas stated, among other things, that "because [Wilkerson was] unable to perform the essential functions of [his] job with or without accommodation," his employment with UTSA was terminated "effective January 21, 2021."

On March 4, 2021, Wilkerson submitted a discrimination charge with the Texas Workforce Commission (TWC) and the federal Equal Employment Opportunity Commission (EEOC). He asserted that he was out of work due to his own medical condition in early 2020, and that during the COVID-19 pandemic, he participated in a rotating work schedule. Wilkerson explained that "[a]fter being diagnosed with multiple disabilities, [he] received paperwork from [Hedrick] that identified as a result of COVID-19 and due to [his] own medical condition, [he] should work from home 100% as a reasonable accommodation." He further explained that he participated "in good faith" with UTSA's interactive process. He elaborated that when he was told he was not able to perform the essential functions of a warehouse worker, he asked about transferring to another position he felt "[he] was qualified to perform." He stated that in January he

13

applied for another position but was notified that he had been terminated. Wilkerson also alleged that Salinas had a conflict of interest "as [he] believe[d Salinas] held animus towards [him] due to [Wilkerson's] previous EEOC complaint (451-2019-02031) where [Salinas] was implicated as one of the people harassing [him] and the basis for that complaint." Wilkerson concluded that he was discriminated against because of his "disability when [his] employer refused to grant [his] accommodation request and failed, in good faith, to engage in the interactive process regarding [his] request for a reasonable accommodation and then subsequently terminating [his] employment in retaliation." On December 28, 2021, the EEOC informed him that after reviewing his complaint, "it [wa]s [their] assessment that further investigation is unlikely to result in a violation of the statutes [they] enforce. [T]he available information/evidence does not support a conclusion that disability . . . or retaliation were factors in [his] employment experiences." The EEOC therefore "decline[d] to take further action on the charge." On March 7, 2022, Wilkerson received a "right to sue" letter from TWC.

## B.    Wilkerson's Lawsuit and UTSA's Assertion of Sovereign Immunity

On May 6, 2022, Wilkerson filed his original petition raising claims under the TCHRA against UTSA. On July 8, 2022, Wilkerson filed his amended petition asserting that "UTSA discriminated against him because of his disability, regarded him as disabled, denied his requests for reasonable accommodations, and retaliated against him because he engaged in protected conduct."

Wilkerson alleged that he "is a qualified individual with a disability in that he suffers from a physical and/or mental impairment or condition that substantially limits one or more

14

major life activities." Wilkerson alternatively alleged that he was "regarded as disabled in that he may suffer from a minor physical impairment that does not limit a major life activity, but which UTSA nonetheless perceived as substantially limiting." He further pleaded that he is qualified for the position of warehouse worker and can perform the essential functions of his job duties with reasonable accommodation. Wilkerson also contended that UTSA failed to engage in a meaningful interactive process or make reasonable accommodations "including, but not limited to, the reassignment of the marginal functions of his job, reassignment to a vacant position, a part-time or modified work schedule, job restructuring, acquisition or modification of equipment or devices, and other similar accommodations." He argued that "UTSA relied upon his disability in its failure and/or refusal to offer or make an accommodation and . . . as the basis upon which to terminate his employment" and that his disability was a motivating factor for the termination.

As to his retaliation claim, Wilkerson alleged he engaged in protected conduct, that he was terminated, and that "a casual connection exists between his protected conduct and termination." Wilkerson requested mental anguish damages, lost past and future wages, and attorney's fees.

On September 13, 2023, UTSA filed an amended plea to the jurisdiction and traditional and no-evidence motions for summary judgment, arguing that it was immune from Wilkerson's claims. UTSA contended that Wilkerson could not a prima facie discrimination claim because he was not "qualified" under the TCHRA. UTSA also argued that Wilkerson could not establish a prima facie reasonable accommodations claim because work from home and reassignment were not reasonable. Concerning

15

reassignment, UTSA alternatively argued that Wilkerson's live pleading "d[id] not identify any specific vacant positions, nor allege[d] facts demonstrating he was qualified for them," and that "there were no vacant positions in Wilkerson's department." UTSA further argued, even "assuming Wilkerson had pled facts sufficiently identifying a vacant position for which he met all the qualifications," that "such transfer would not have been a reasonable accommodation because UTSA has a best-qualified candidate policy." It argued that ACA and TCHRA do "not require mandatory reassignment of a disabled employee to a vacant position when the transfer would violate an employer's policy of hiring the most-qualified applicant."

Regarding Wilkerson's retaliation claim, UTSA argued that

there is no evidence of temporal proximity between protected activity in 2019 and any adverse employment action alleged in his pleading. Further, there is no evidence of 1) any negative expressions towards any protected activity; 2) a failure by UTSA to follow policies; 3) disparate treatment compared to similarly situated employees; or 4) falsity of the stated reasons for termination.

In support of its motions, UTSA attached, among other things, the following: an email sent by Gonzales to Wilkerson on September 10, 2020; an email sent by Wilkerson to Gonzales on October 13, 2020, seeking accommodation; a copy of the warehouse worker job description; Wilkerson's accommodation request form; Wilkerson's resume; an email sent by Esparza to Wilkerson on October 13, 2020; an email sent by Gonzales to Wilkerson on October 15, 2020; Hedrick's medical inquiry form signed on November 3, 2020; a letter sent by Huguley to Wilkerson on December 9, 2020; an email sent by Huguley to Wilkerson on December 10, 2020; a return to work release form signed by Hedrick on December 11, 2020; an email sent by Hedrick to Esparza on December 14,

16

2020; a letter and email sent by Huguley to Wilkerson on January 4, 2021; a letter signed by Salinas to Wilkerson and dated January 21, 2021; an email sent by Salinas to Wilkerson on January 22, 2021; Wilkerson's June 30, 2023 deposition; Esparza's July 6, 2023 deposition; Esparza's declaration signed on September 6, 2023; and Gonzales's declaration signed on September 7, 2023.

UTSA's traditional motion for summary judgment incorporated the same evidence and arguments as its plea to the jurisdiction. UTSA's no-evidence plea challenged various elements of each cause of action.

## C. Wilkerson's Response

On November 7, 2023, Wilkerson filed a response to UTSA's plea to the jurisdiction and motions for summary judgment. Wilkerson attached the following exhibits to his response: EEOC's investigative file concerning Wilkerson's 2021 charge of discrimination and retaliation against UTSA; transcripts of deposition testimony by Wilkerson, Esparza, Huguley, Salinas, and Mendez, with attached exhibits; UTSA's September 15, 2022 response to Wilkerson's request for interrogatories; UTSA's July 19, 2023 amended response to Wilkerson's request for interrogatories; UTSA's "position statement" concerning Wilkerson's 2021 charge of discrimination with the EEOC; and a transcript and audio recording of the ADA meeting with Wilkerson, Esparza, and Huguley. [4] Wilkerson contended, among other things, that he "established his prima facie case of retaliation and that genuine issues of material fact exist regarding the UTSA's stated reasons for discharging him."

---

[4] The audio recording is not included in the appellate record.

**D.     Trial Court Ruling**

On November 29, 2023, the trial court signed its written order denying UTSA's amended plea to the jurisdiction and motions for summary judgment. This interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(5).

## II.     STANDARD OF REVIEW AND APPLICABLE LAW

Subject matter jurisdiction is essential to a court's authority to decide a case. *In re Abbott*, 601 S.W.3d 802, 807 (Tex. 2020) (orig. proceeding) (per curiam) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993)). Whether a trial court has subject matter jurisdiction is a question of law we review de novo. *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016).

Sovereign immunity is a common law doctrine that protects the State and its agencies from lawsuits for money damages and deprives a trial court of subject matter jurisdiction over the plaintiff's claims. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 & n.2 (Tex. 2008) (*Garcia I*). Generally, governmental entities in Texas, such as UTSA, are immune from lawsuits unless the Legislature has expressly waived their immunity by statute. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002); *see Tex. S. Univ. v. Villarreal*, 620 S.W.3d 899, 904 (Tex. 2021) (observing that state universities are governmental entities entitled to immunity).

"A plaintiff has the burden to affirmatively demonstrate the trial court's jurisdiction." *Town of Shady Shore v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012)). Thus, when a plaintiff sues a governmental entity, they must allege facts that fall within a legislative waiver of immunity.

*Id.* (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)). A governmental defendant may challenge the trial court's jurisdiction by attacking the plaintiff's pleadings, the existence of jurisdictional facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). "If the trial court denies the governmental entity's claim of no jurisdiction, whether it has been asserted by a plea to the jurisdiction, a motion for summary judgment, or otherwise, the Legislature has provided that an interlocutory appeal may be brought." *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004) (first citing TEX. CIV. PRAC. & REM. CODE § 51.014; and then citing *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 245 n. 3 (Tex. 2004)).

When a defendant challenges the existence of jurisdictional facts, as UTSA has done here, the analysis "mirrors that of a traditional summary judgment." *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012) (*Garcia II*)). As such, we take as true all evidence favorable to Wilkerson, indulging every reasonable inference and resolving any doubts in his favor. *See id.* (citing *Alamo Heights*, 544 S.W.3d at 771). Once a governmental entity establishes the absence of a jurisdictional fact, the burden shifts to the plaintiff to raise a genuine issue of material fact for the jury to resolve; otherwise, the trial court should rule on the plea to the jurisdiction as a matter of law. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004).

Section 21.051 of the labor code states:

An employer commits an unlawful employment practice if because of . . . disability . . . the employer . . . fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or

19

privileges of employment . . . .

TEX. LAB. CODE § 21.051(1). "'Disability' means, with respect to an individual, a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment." *Id.* § 21.002(6). "Major life activity" encompasses a wide number of functions, which includes, but is not limited to:

> caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. The term also includes the operation of a major bodily function, including, but not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

*Id.* § 21.002(11-a). This statute "applies only to discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job." *Id.* § 21.105.

Section 21.128 provides that an employer commits an unlawful employment practice if it "fail[s] or refuse[s] to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability who is an employee," unless the employer "demonstrates that the accommodation would impose an undue hardship on the operation of [its] business." *Id.* § 21.128(a); *Lara*, 625 S.W.3d at 52. Claims under §§ 21.128 and 21.051 are distinct causes of action. *See Harmon v. Tex. S. Univ.*, 672 S.W.3d 684, 689 n.1 (Tex. App.—Houston [14th Dist.] 2023, no pet.).

Section 21.055 provides that an employer commits an unlawful employment practice if the employer retaliates or discriminates against a person who, under chapter

21 of the labor code, "(1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX. LAB. CODE § 21.055. An "employer" includes "a county, municipality, state agency, or state instrumentality, regardless of the number of individuals employed." *Id.* § 21.002(8)(D). A "state agency" includes "an institution of higher education as defined by [§] 61.003, Education Code." *Id.* § 21.002(14)(C).

The TCHRA waives a governmental employer's immunity from suit for violations of said statute. *Alamo Heights*, 544 S.W.3d at 770 (citing *Garcia II*, 372 S.W.3d at 637); *see* TEX. LAB. CODE § 21.254 (permitting an employee to "bring a civil action against" their employer). Because the TCHRA was modeled after federal statutes, Texas courts are guided by federal precedent interpreting those statutes. *Lara*, 625 S.W.3d at 52 (citing *Garcia II*, 372 S.W.3d at 634).

Violations of the TCHRA can be established with either direct or circumstantial evidence, and for cases based on circumstantial evidence, Texas courts generally employ the three-part *McDonnell Douglas* burden-shifting framework. *Alamo Heights*, 544 S.W.3d at 781–82 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)). First, the employee must establish a prima facie case of discrimination, which gives rise to a rebuttable presumption that a statutory violation occurred. *Id.* at 782 (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–54 (1981)). The employer may then rebut this presumption by offering a legitimate, nondiscriminatory reason for the disputed employment action. *Id.* (citing *Burdine*, 450 U.S. at 254–55). This is a burden of production, not persuasion, and involves no credibility assessment. *See Reeves v.*

21

*Anderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). "Once rebutted, the presumption disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination." *Alamo Heights*, 544 S.W.3d at 782 (citing *Burdine*, 450 U.S. at 255–56). Each step of the *McDonnell Douglas* analysis is jurisdictional in nature. *Id.* at 783.

### III.   ANALYSIS

In its first issue, UTSA argues that Wilkerson failed to establish a prima facie reasonable accommodations claim under § 21.128 because his request to work from home full-time was not a reasonable accommodation. In its second issue, UTSA argues that Wilkerson failed to establish a prima facie reasonable accommodations claim because his request to transfer to another position was also not a reasonable accommodation. In its third issue, UTSA argues that Wilkerson failed to establish a prima facie discrimination claim because he was not "qualified" for his position. In its fourth issue, UTSA argues that Wilkerson "cannot demonstrate a causal link between any adverse employment action and protected activity to establish a retaliation claim." In its fifth issue, UTSA argues that Wilkerson "cannot raise a genuine issue of material fact on whether UTSA's legitimate reasons for its adverse employment actions were both false and pretextual." We address UTSA's first and second issues together, and then each subsequent issue in turn.

### A.   Reasonable Accommodations

To establish a prima facie reasonable accommodation claim under § 21.128, "a

22

plaintiff must show (1) he has a 'disability;' (2) an employer covered by the statute had notice of his disability; (3) with 'reasonable accommodations' he could perform the 'essential functions' of his position; and (4) the employer refused to make such accommodations." *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 439 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see also* TEX. LAB. CODE § 21.128. UTSA does not dispute that it is covered by the statute, that Wilkerson was disabled, or that he requested accommodations for his disability. "Once an employee makes such a request, . . . the employer is obligated by law to engage in an 'interactive process': 'a meaningful dialogue with the employee to find the best means of accommodating that disability.'" *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009) (quoting *Tobin v. Liberty Mut. Ins.*, 433 F.3d 100, 108 (1st Cir. 2005)). The ADA provides a right to reasonable accommodations, not the employee's preferred accommodation. *Hagood v. County of El Paso*, 408 S.W.3d 515, 525 (Tex. App.—El Paso 2013, no pet.). As the plaintiff, it was Wilkerson's burden to request reasonable accommodations. *See LeBlanc v. Lamar State Coll.*, 232 S.W.3d 294, 300 (Tex. App.—Beaumont 2007, no pet.). "The concept of 'reasonable accommodation' embodies the notion that, with the accommodation, the employee will be qualified to perform the job's essential functions." *Id.* at 302 (citing *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093–94 (5th Cir. 1996)).

"When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations." *Chevron Phillips Chem. Co., LP*,

23

570 F.3d at 621; *see also Harmon*, 672 S.W.3d at 690–95 (applying *Chevron Phillips* to TCHRA claims); *Hagood*, 408 S.W.3d at 525. However, when the employee is responsible for the breakdown of the interactive process, the employer has not violated the ADA. *See Hagood*, 408 S.W.3d at 525. We note that the *McDonnell Douglas* burden-shifting framework is not applicable to a reasonable accommodation claim. *See Donaldson*, 495 S.W.3d at 439.

Regarding its first issue, UTSA argues that Wilkerson's request to work from home was not a reasonable accommodation for his disability because said accommodation "would eliminate or require reallocating the essential functions of his warehouse worker job, such that Wilkerson would essentially not be a warehouse worker." We agree. "Essential functions are fundamental, as opposed to marginal, job duties, . . . such that a job is fundamentally altered if an essential function is removed." *Credeur v. La. ex rel. Off. of Att'y Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) (citation modified). "The ADA does not require an employer to 'reallocate essential functions' to accommodate an employee with a disability." *Id.* at 795. The record evidence demonstrates that the vast majority of the functions of a warehouse worker require an employee to do those functions at the university or the warehouse. Thus, attendance in person is an essential function of a warehouse worker. *See Robert v. Bd. of Cnty. Comm'rs*, 691 F.3d 1211, 1217 (10th Cir. 2012) (holding that a function making up twenty-five to fifty percent of position was essential); *Colon-Fontanez v. Mun. of San Juan,* 660 F.3d 17, 34 (1st Cir. 2011) (employee did not perform essential function of attendance at work when she was absent more than twenty percent of the time). Furthermore, the evidence showed that driving

made up about fifty percent of a warehouse worker's position; therefore, driving is also an essential function of a warehouse worker. *See Robert*, 691 F.3d at 1217.

Wilkerson points out that UTSA's job description of a warehouse worker does not describe "reporting for duty 'in person'" as an essential function. While true, we cannot conclude this constitutes affirmative evidence that raises a fact issue concerning whether attendance in person was an essential function of Wilkerson's job. Wilkerson further argues that UTSA had "implemented a remote work schedule for [him] and four other non-disabled [w]arehouse [w]orker employees." We disagree. The evidence demonstrates that UTSA implemented a rotating schedule in response to COVID-19. According to Gonzales, when the rotation schedule was in effect, warehouse workers were not working on campus, "they were at home, simply on-call or completing online trainings provided by the university," and "were not assigned work to perform while at home." We have found no evidence that warehouse workers performed any essential functions from home. Furthermore, Wilkerson's subjective beliefs that he could perform "seven of the nine" job duties by working from home are mere conclusions that do not raise a fact issue as to whether attendance in-person was an essential function of his warehouse job, or whether his requested accommodation was reasonable. *See Miranda*, 133 S.W.3d at 228. In sum, the record indicates that Wilkerson could not perform the essential functions of his warehouse job by working from home. Consequently, Wilkerson's request to work from home was not a reasonable accommodation. *See Miranda*, 133 S.W.3d at 228.

In its second issue, UTSA argues that "[n]either Wilkerson's [p]etition, nor the record evidence, indicates that there were any vacant positions for which Wilkerson was

25

qualified." Under the applicable statutes, reassignment to a vacant position may be a reasonable accommodation. *See* 42 U.S.C. § 12111(9)(B); *see also Smith v. Mary Kay, Inc.*, No. 05-97-00095-CV, 1999 WL 706435, at *4 (Tex. App.—Dallas Sept. 13, 1999, no pet.) (mem. op., not designated for publication) (holding that reassignment to a vacant position is a reasonable accommodation under the TCHRA). "When no reasonable accommodation can be made to the plaintiff's prior job, he may be transferred to another position." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) (first citing 42 U.S.C. § 12111(9)(B); and then citing *Gonzales v. City of New Braunfels*, 176 F.3d 834, 838 (5th Cir. 1999)). "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." *Id.* 315–16 (citing *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 & n. 14 (5th Cir. 1997)).

The EEOC's investigative file contained a typewritten response by Wilkerson to UTSA's position statement. In said response, Wilkerson wrote the following:

> First and foremost, reassignment was not considered by UTSA. On or about Dec. 2020, I applied for an Administrative Associate I and an Administrative Assistant position, both of which are remote positions that I am qualified for (see attached). These positions would have accommodated my disability without any adjustment. I included my resume that I used for said positions. [UTSA]'s [Human Resources] department would also have copies of the application process for both. The ADA coordinator's only correspondence was in Dec[ember] telling me to apply for those positions, where I replied that I did. [The ]ADA[ coordinator ]would not respond after Jan[uary] regarding any information on these jobs.

The EEOC investigative file also contained Wilkerson's resume and a copy of UTSA's job descriptions for the administrative positions Wilkerson purportedly applied for. Additionally, Wilkerson stated in his deposition that he had applied for three positions in

26

the Psychology, Art, and Modern Languages departments at UTSA in December 2020. When asked about the outcome of those job applications, Wilkerson stated that he had reached out to "[the] ADA[ coordinator], and she said she was going to contact me about those positions and never did."

The record contains no evidence that any of the positions that Wilkerson purportedly applied for were actually vacant or available. *See Jenkins*, 487 F.3d at 315; *Foreman*, 117 F.3d at 810 ("For the accommodation of a reassignment to be reasonable, it is clear that a position must first exist and be vacant."). To hold otherwise would require this Court to infer vacancy by mere statements that a person filed a job application. Under these circumstances, we cannot conclude that said inference is reasonable, even viewing the evidence in light most favorable to Wilkerson. *See Lara*, 625 S.W.3d at 52. Moreover, Wilkerson's statement that he was qualified for the positions he purportedly applied for is conclusory and insufficient to create a fact issue on whether he was qualified for said positions. *See Jenkins*, 487 F.3d at 315; *see also Wolfe v. Devon Energy Prod. Co., LP*, 382 S.W.3d 434, 452 (Tex. App.—Waco 2012, pet. denied) ("A conclusory statement is one that does not provide the underlying facts to support the conclusion."); *Concierge Nursing Ctrs., Inc. v. Antex Roofing, Inc.*, 433 S.W.3d 37, 50 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding that conclusory statements—i.e., those expressing factual inference without stating underlying facts on which inference is based—are incompetent to support summary judgment). Furthermore, neither of the job descriptions for the administrative positions indicate that they were "remote positions"—therefore, Wilkerson's statements that said positions were remote and would have accommodated

27

his disability without adjustment are also conclusory. *See Wolfe*, 382 S.W.3d at 452; *Concierge Nursing Ctrs*, 433 S.W.3d at 50. Thus, there is no evidence in the record raising a fact issue that Wilkerson could, with reasonable accommodations, perform said positions. *See Jenkins*, 487 F.3d at 315. Consequently, we conclude the record evidence does not raise a genuine issue of material fact regarding whether Wilkerson's request for reassignment was a reasonable accommodation. *See Miranda*, 133 S.W.3d at 228.

Wilkerson contends that UTSA failed to engage in the interactive process to discuss his disability and potential accommodations when it "ended the process at the first attempt at accommodation without further effort." *See Chevron Phillips Chem. Co., LP*, 570 F.3d at 621. We disagree with Wilkerson's characterization of the evidence, which ignores his own role in the process. Nothing in the record demonstrates that UTSA, "instead of engaging in the interactive process that the ADA requires, simply refused to consider [Wilkerson's] request for accommodation." *Id.* at 622. The evidence shows that UTSA solicited input from Wilkerson's doctor concerning his disability, limitations, and proposed accommodations. Furthermore, Huguley and Esparza met with Wilkerson via videoconference to discuss his request for accommodations and informed him that work from home was not a reasonable accommodation for his warehouse job. Huguley solicited information from Wilkerson concerning his disability, and Wilkerson explained that he had frequent panic attacks triggered by driving or riding in a vehicle and endured "great distress" from face-to-face interactions with coworkers and customers. Wilkerson rejected a half-hour break as an accommodation for his panic attacks and continued to reiterate that he wanted to work from home or a transfer to a position that would permit him to work

28

from home. Regarding the topic of transfer, Huguley informed Wilkerson that "because of the [reduction in force] that [UTSA] just went through, there are no other positions that . . . they can transfer—you know, talk to—to transferring you to. But even if they transfer you, we would still have to let you apply to that job."

"A truly interactive process is a reciprocal process in which *both* employer and employee contribute—not one that ends with the first attempt at accommodation, but one that *continues when the employee asks for a different accommodation*." *Gonzalez v. United Parcel Serv.*, 777 F. App'x 735, 739 (5th Cir. 2019) (citation modified). Here, there is no evidence demonstrating that Wilkerson asked for a different accommodation apart from his requests to work from home or transfer to a position that would permit him to work from home. Consequently, we conclude the record evidence does not raise a genuine issue of material fact regarding whether UTSA failed to engage in the interactive process. *See Miranda*, 133 S.W.3d at 228; *Gonzalez*, 777 F. App'x at 739.

Because Wilkerson failed to establish a prima facie reasonable accommodation claim, the trial court erred by denying UTSA's assertion of sovereign immunity as to this claim. *See Alamo Heights*, 544 S.W.3d at 781–82. We sustain UTSA's first and second issues, and reverse and render judgment dismissing Wilkerson's reasonable accommodation claim against UTSA.

B.    Discrimination

In its third issue, UTSA argues that Wilkerson failed to establish a prima facie disability discrimination claim because he was not "qualified" for his position.

To establish a prima facie case of disability discrimination under § 21.051,

29

Wilkerson must show (1) he has a disability; (2) he is "qualified" for the job; and (3) he suffered an adverse employment decision—here, that his employment was terminated—because of his disability. *Donaldson*, 495 S.W.3d at 436; *see also* TEX. LAB. CODE § 21.051. UTSA specifically argues that Wilkerson was not qualified for his warehouse worker job because the evidence demonstrated that he could not perform its essential duties. According to UTSA, "Wilkerson's warehouse worker job required him to physically work with items on-site in the warehouse loading and unloading shipments, packages, and freight, as well as making deliveries by driving or riding in a delivery van." UTSA further argues that "Wilkerson's inability to be in a vehicle or physically attend work means that he was not qualified for the warehouse position."

Wilkerson can show that he was qualified for his position "in one of two ways: (1) by proving that he can perform all essential job functions with or without modifications or accommodations; or (2) by showing that some reasonable accommodation by the employer would enable him to perform the job." *Donaldson*, 495 S.W.3d at 437. Regarding whether Wilkerson could perform these essential functions, Hedrick's medical inquiry form stated that Wilkerson suffered from panic disorder and post-traumatic stress disorder, and that his "panic causes difficulty thinking and concentration while driving [and] interferes with interactivity with customers due to high cortisol levels which cloud problem solving." In addition, she recommended that Wilkerson work from home. During the videoconference with Esparza and Huguley, Wilkerson stated that he suffered panic attacks when he drove or rode in a vehicle and that these attacks "could probably take most of the day." When Huguley asked Wilkerson if he could be accommodated by being

30

permitted a thirty-minute break when suffering a panic attack, Wilkerson replied, "No. I've had that issue in the past, but sometimes it can be 45 minutes, an hour, or the rest of the afternoon. It depends upon the attack. It depends on the trigger. A lot of it has to do—my triggers are associated with people I work with."

Wilkerson stated that being in the warehouse and face-to-face with coworkers and customers caused him "great distress." He further stated that his history with his department, his management, and his "personal history with driving," "made it nearly impossible for [him] to go to work to complete [his] job." Hedrick's "Return to Work Release Form" indicated that Wilkerson could return to work, subject to restrictions on driving equipment or vehicles or working with machinery, until November 2, 2021. Hedrick reiterated in her December 14, 2020 email to Esparza that because driving and operating heavy machinery were essential job duties, she and Wilkerson were requesting "the accommodation that he work from home."

As discussed above, Wilkerson's request to work from home was not a reasonable accommodation for his warehouse worker job, for which driving and attendance in person were essential functions. The evidence demonstrated that Wilkerson could not perform all essential job functions—including driving and attending work in person—with or without modification or his requested accommodations. *See id.* Viewing the evidence in the light most favorable to Wilkerson, we conclude that the record evidence fails to raise a genuine issue of material fact that he was qualified for his warehouse worker job at the time his employment was terminated. *See Alamo Heights*, 544 S.W.3d at 771; *Miranda*, 133 S.W.3d at 228; *Donaldson*, 495 S.W.3d at 437.

Because Wilkerson failed to establish a prima facie discrimination claim, the trial court erred by denying UTSA's assertion of sovereign immunity as to this claim. *See Alamo Heights*, 544 S.W.3d at 781–82. We sustain UTSA's third issue, and reverse and render judgment dismissing Wilkerson's discrimination claim against UTSA.

## C. Retaliation

In its fourth issue, UTSA argues that Wilkerson failed to establish a prima facie retaliation claim.

To establish a prima facie case of retaliation under § 21.055, Wilkerson must show "(1) [he] engaged in an activity protected by the TCHRA, (2) [he] experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action." *Lara*, 625 S.W.3d at 58; *see also* TEX. LAB. CODE § 21.055. Specifically, UTSA argues that Wilkerson did not establish the third element required for a retaliation claim. *See Lara*, 625 S.W.3d at 58.

In his 2021 charge filed with the EEOC, Wilkerson complained of retaliation due to his previous EEOC charge in 2019. Wilkerson indicated in the 2021 charge that Salinas "was implicated as one of the people harassing me and the basis for [the 2019] complaint." Wilkerson stated in the 2021 charge that he believed Salinas "held animus" towards him due to his 2019 charge. UTSA argues that Wilkerson failed to demonstrate a causal connection between the 2019 charge and the termination of his employment in 2021 due to lack of temporal proximity. We agree. The gap between the 2019 protected activity and Wilkerson's termination in 2021, which is more than one year, is generally considered too long to support a finding of temporal proximity giving rise to an inference

32

of causation. *See County of El Paso v. Aguilar*, 600 S.W.3d 62, 92–93 (Tex. App.—El Paso 2020, no pet.) (finding seven-month gap between protected activity and constructive discharge, without more, insufficient to give rise to inference of causation); *Donaldson*, 495 S.W.3d at 444 (six-month gap between filing complaint of discrimination and adverse employment action was too long to create a presumption of retaliation). As the United States Supreme Court has recognized, the "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Furthermore, the record contains no evidence detailing the 2019 charge or its outcome, other than Wilkerson's belief that he was retaliated by UTSA because of it. An employee's subjective belief of discrimination or retaliation, without more, is insufficient to support the causal connection in an employment discrimination case. *Tex. Dep't of Motor Vehicles v. Bustillos*, 630 S.W.3d 316, 333 (Tex. App.—El Paso 2021, no pet.).

Wilkerson argues that he engaged in a protected activity when he requested accommodation and filed "grievances" with UTSA. We disagree. In *Lara*, the Texas Supreme Court held that to trigger the protections of Chapter 21, "the conduct relied on by the employee 'must, at a minimum, alert the employer to the employee's reasonable belief that unlawful discrimination is at issue.'" 625 S.W.3d at 59 (quoting *Alamo Heights*, 544 S.W.3d at 786). Thus, to invoke the antiretaliation protection of Chapter 21, Wilkerson's accommodation request and subsequent grievances must have alerted

33

UTSA to his belief that discrimination was at issue. *Id.* at 60. Because there is no evidence Wilkerson opposed any discriminatory practice in his accommodation requests or grievances, he cannot make a prima facie case of retaliation based on his engagement in those activities. *See id.* at 60–61.

Wilkerson further argues that at the meeting with Esparza and Huguley, he "asserted that their continued refusal to grant him a reasonable accommodation or transfer amounted to discrimination based on his disability and retaliation for his previous accommodation and transfer requests." We disagree. Even viewing the transcript of said meeting in the light most favorable to Wilkerson, we cannot conclude that said transcript constitutes evidence that Wilkerson alerted UTSA of his belief that unlawful discrimination was at issue. Thus, Wilkerson cannot make a prima facie case of retaliation based on statements he made at the meeting with Esparza and Huguley. *See id.*

Because Wilkerson failed to establish a prima facie retaliation claim, the trial court erred by denying UTSA's assertion of sovereign immunity as to this claim. *See Alamo Heights*, 544 S.W.3d at 781–82. We sustain UTSA's fourth issue, and reverse and render judgment dismissing Wilkerson's retaliation claim against UTSA.[5]

## IV. CONCLUSION

Having sustained UTSA's first, second, third, and fourth issues, we reverse the trial court's order denying UTSA's amended plea to the jurisdiction and traditional and no-

---

[5] Because we have determined that Wilkerson failed to establish a prima facia case of discrimination and retaliation, we decline to address UTSA's fifth issue contending that Wilkerson failed to raise a genuine issue of material fact that its legitimate reasons for terminating his employment were both false and pretextual. *See* TEX. R. APP. P. 47.1; *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 781–82 (Tex. 2018) (noting that the *McDonnel Douglas* burden-shifting steps in discrimination claims also apply to retaliation claims).

34

evidence motions for summary judgment. We further render judgment in favor of UTSA and dismiss all of Wilkerson's claims against UTSA for lack of subject matter jurisdiction based on UTSA's sovereign immunity.

CLARISSA SILVA<br>
Justice

Delivered and filed on the
26th day of January, 2026.